O’NIELL, C. J.
This is a contest for the Democratic nomination for the office bf sheriff of Winn parish. The contestant has appealed from a judgment in favor of the contestee. The official returns gave the defendant a majority of 115 votes. At the instance of the plaintiff and .over the objection of the defendant, the court ordered the ballot boxes opened and the ballots recounted; the result being to increase the defendant’s majority to 118 votes.
It is mutually conceded that it is not important now, for the purpose of this appeal, whether we take the defendant’s prima facie *768 or initial majority to be 115, as shown by the official returns, or 118, as shown by the recount of the ballots. There is therefore no occasion for our considering the question of correctness of the courtis ruling, ordering the recount.
Plaintiff contends that, among the votes cast for defendant, 72 were cast by persons who were disqualified, for various reasons, in most instances for failure to pay the poll taxes for each of the years 1922 and 1923. Plaintiff contends also that the returns from four precincts in which defendant received majorities, namely, Sikes, Dodson, Winnfield and Evergreen, should be thrown out, because of certain alleged irregularities and illegalities in the manner of holding the election in those precincts.
We pretermit the question whether plaintiff had the right to prove by the testimony of the 72 voters alleged to have been disqualified that they voted for the defendant. It is conceded by appellant that, if the 72 votes complained of were, illegal, then for the same reason, 22 of the ballots cast that were for him Were illegal; the net result of the alleged illegal ballots being that the appellee’s majority should, for that reason alone, be reduced 50 votes. All objections to the proof as to how the alleged disqualified voters voted are therefore waived and abandoned. For that reason, and more because it is not necessary for a decision of this case, we shall not decide now whether the proof as to how the alleged disqualified voters voted was admissible. For argument’s sake only, we accept the mutual admission that the proof was admissible. The result is to reduce the defendant’s majority to 65.
Taking up the alleged irregularities and illegalities in the manner of holding the 'election in the four precincts complained of, we find that an elimination of the returns from the Sikes precinct would not, of itself, Change the regult, but would only reduce the defendant’s majority 15 votes. His majority at Sikes, according to the official returns, was 18 votes, in which are included 3 of the 72 alleged illegal votes, heretofore referred to.
We are of the opinion, however, that the returns from the Sikes precinct should not be thrown out. The arrangement of the polling place is not seriously complained of. It was a small house, having two rooms, separated by a hall 5 feet wide. Each room had a door opening into the hall, the doors being opposite each other. The commissioners, with the ballots and ballot boxes, were in one room, near the door, where the voters received their ballots. Each voter, on receiving a ballot, went to the room across,the hall, where he marked the ballot, and returned and deposited it in the box at the door of the room where the commissioners were. The serious complaint of the manner of conducting the election in that precinct is that the commissioner who handed out the ballots "tore off the detachable slip, bearing the number of the ballot, as each ballot was handed to the voter. The numbered slip, of course, should not have been detached until the voter had marked his ballot and returned with it to be deposited in the box. The purpose of having the number on the ballot is to enable the commissioners to identify the ballot prepared and folded by the voter, as being the same ballot that was given by the commissioners to the voter; and the purpQse of detaching the number from the marked dnd folded ballot, when the voter is ready to deposit it in the box, is to destroy the identification. The purpose of identifying the folded ballot tendered by the voter, as, being the same that was given to him by the commissioners, is to make the so-called “endless chain” system of voting impossible. See Hart v. Picou, 147 La. 1017, 86 South. 479. In the case before us, however, the commissioners who testified that *770 the numbers were detached from the ballots when they were handed to the votérs were two of the commissioners who had represented the plaintiff at that precinct. They were apparently frank and fair in their statements. They testified that there was no fraud committed; that the arrangement of the voting place was such that it was not likely that the voters „ operated the so-called “endless chain” system; or that any voter voted any other ballot than the one given to him by a commissioner. The two commissioners who testified acknowledged that they had not protested against the detaching of the numbers when the ballots were handed out. They said, on the contrary, that they had, tacitly, at least, approved of the detaching of the numbers from the ballots when they were handed out, because they, like the other commissioners, believed that that was the proper way of handling the ballots. In the case of Hart v. Picou, supra, all of the ballots were printed and furnished without detachable numbers. There was not a valid ballot cast, or a valid .ballot to be cast. A protest against the form of ballots would not have been availing. The election was therefore annulled. But it is not so in this case, because a protest against the wrongful detaching of the ballot numbers would probably have been heeded.
At the Dodson precinct, the defendant’s majority was 67. Included therein were 3 of the 72 alleged illegal votes that were cast for defendant, and 2 of the 22 alleged illegal votes that were cast for plaintiff; leaving a net majority of 66 for defendant, in that precinct. Plaintiff avers that the arrangement of the voting place at Dodson was such that the voters could not mark their ballots secretly. The voting place was on the ground floor of an abandoned bank building. There was ample room and. opportunity for the voters to mark their ballots in secrecy, and we háve no reason to doubt that every voter did mark his ballot in secrecy. It is not contended that there is proof that fraud was committed at that precinct.
At the Winnfield precinct, the defendant’s majority was 55, including, however, 6 of the 72 alleged illegal votes heretofore mentioned. Therefore, if the returns from Winnfield should be thrown out, defendant’s net loss would be 49 votes. The polling place was in the police jury room, a room measuring 20x32 feet, on the ground floor of the courthouse. There was ample room and opportunity for every voter to mark his ballot secretly; and we have no reason to doubt that the balloting was done secretly. The only commissioners who testified on the subject were two who had represented the plaintiff at that precinct. They said frankly, that they did not know of any fraud or wrong doing at the precinct. The only irregularity in the manner of conducting the election there was that the commissioners closed the polls, for about 30 minutes, between 12 and 1 o’clock, while they ate their lunch'. But they remained at the polling place, ready to allow any one to vote; and there is no proof that any one was denied the right to vote. A witness testified that two men came as if to vote, and having asked a bystander when the poll would be opened again, went away. There is no proof'as to whether they returned and voted. The polls should have remained open continuously from 6 a. m. to 7 p. m. But the fact that the polling place was closed by the commissioners during the lunch hour is not, of itself and without proof that any voter was denied the right to vote, a good cause for annulling the election at that precinct, or for throwing out the returns. Madere v. Sellers, 120 La. 812, 45 South. 735; Womack v. Nettles (La. No. 26471) ante, p. 359, 99 South. 290; 20 C. J. 174.
 The complaint about the voting at *772 Evergreen is, as plaintiff alleged, that the polling booths were not properly arranged; that the voters could not vote secretly, and that they mingled in the- crowd with their ballots in their hands. We infer from the brief of appellant that he concedes that the irregularities, if any there were, in the conduct of the election at Evergreen, were not so serious as they were thought to be when thp allegations were made. The polling place was in an abandoned schoolhouse, which the parish had fitted up for the purpose of holding elections, and which had been the customary polling place for a long time. There was a stage in one end of the building. The commissioners, with the ballots and ballot boxes, sat at a table at one end of the stage, and at the other end were two polling booths. It appears that the secrecy of the ballot was well preserved. One witness testified that, from a position outside of the building, he saw a man look through the window of one of the polling booths to see how a voter was marking his ballot. We' doubt that the man looking through the window could see how the voter marked his ballot. Even so, one instance of such ,wrong doing would not justify our annulling the election for the precinct, or throwing out the returns. The complaint that voters with their ballots in their hands mingled with the erowq has reference to only one voter. When he had received his ballot from a commissioner and was about to enter the booth to mark the ballot, he discovered that he had not his glasses. He stepped down from the stage, borrowed a pair of glasses from a neighbor whom he recognized, and returned immediately to the booth. He testified that he marked and voted the same ballot which the commissioner^ had given him, and that his only purpose in turning aside from voting was to borrow his neighbor’s glasses. There was no harm done.
Appellant’s counsel point out evidence in the record tending to 'show, in a general way, that frauds were committed in the issuing of poll tax receipts from the sheriff’s office for the year 1922. The defendant in this case is the incumbent sheriff and ex officio tax collector. He has held the position. at least four years continuously. It appears that the receipt which he received from the school superintendent for poll taxes paid in 1922 showed 66 less payments than the duplicate receipts or stubs showed, and 159 less than the poll book prepared in the sheriff’s office showed. Whether the apparent discrepancies have been or can be accounted for is a matter which we need not and do not decide in this case. There is no showing that any voters voted without having paid their poll taxes for the years 1922 and 1923, except those who were included among the voters of the 94 alleged illegal ballots, 72 of which were cast for the defendant and 22 of which were cast for plaintiff. As we have already said, if all of those votes, should be thrown out, it would not change the result.
It is suggested in appellant’s brief that, if we do not declare him the nominee, we should annul the election. It is conceded that he did not pray, even in the alternative, to have the election annulled. He did not charge that the alleged irregularities and illegalities complained of in his petition were serious enough to annul the election. On the contrary, he sought to have the benefit of the election, so far as the proceedings were not illegal or irregular, in his opinion, and so far as the result was favorable to him. Whether, under any circumstances, we can annul an election in response to such pleadings is a matter which we need not decide now. The case is not like that of Hart v. Picou, where every ballot was illegal and the election was therefore null ab initio. Nor is the case like that of Bartmess v. Hendricks, 150 La. 627, 91 South. 68, *774 where a majority of all of the voters who voted at the election were deprived of their right of suffrage, through no fault on their part. The election in the case before us was not absolutely null, and we doubt that the illegalities and irregularities complained of would warrant our annulling it, even if the plaintiff had prayed for such relief.
The law compels us to decide these election contests within 24 hours after they are submitted. The official ballots for the general election must go to the printing press tomorrow. The transcript in this case, containing nearly 2,000 typewritten pages, embracing the testimony of more than 200 witnesses, besides 400 or more original documents, was filed here only two days ago. It has been impossible for us to give the record the thorough study which it should have had if we had had the time. If we should not render a decision now, in time for the successful candidate to have his name printed on the official ballot, the contestee would, under section 31 of Act 97 of 1922, p. 201, be declared the nominee. The result of our ruling is the same.
The judgment is affirmed at appellant’s cost.
DAWKINS, J., concurs in the decree.